IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **RICHARD HARRIS AND GABRIELLE HARRIS**, | Case No. 3:22-cv-1346-SI |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **SAFECO INSURANCE COMPANY OF ILLINOIS**, | |
| Defendant. | |

Ralph C. Spooner and Tyler E. Staggs, SPOONER STAGGS TRIAL LAWYERS, 530 Center Street NE, Suite 712, Salem, OR 97301; and Robert E.L. Bonaparte and Stephen Leggatt, BONAPARTE & LEGGATT LLC, One SW Columbia Street, Suite 460, Portland, OR 97204. Of Attorneys for Plaintiffs.

Lloyd Bernstein and Sean Downing, WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP, 805 SW Broadway, Suite 2460, Portland, OR 97205. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiffs Richard and Gabrielle Harris bring this lawsuit seeking nearly $15.5 million from their insurer, Safeco Insurance Company of Illinois ("Safeco"). Before the Court is Safeco's Motion for Summary Judgment. Safeco argues that Plaintiffs fail to show that there is a genuine dispute as to any material fact and no reasonable juror could conclude that Safeco committed negligence *per se* by violating any alleged subsection of Oregon Revised Statutes

("ORS") § 746.230(1). For the reasons discussed below, the Court grants in part and denies in part Safeco's motion.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not

those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## BACKGROUND

On August 2, 2022, Plaintiffs suffered damage to their home and personal property caused by a fire that began when one of their dogs turned on the kitchen stove. Mrs. Harris came home after the fire had already started and was able to put it out by herself. Due to smoke damage and other issues from burning plastic, and concerned for their two young children then ages three and four, Plaintiffs did not consider their residence habitable without repair. At the time, Plaintiffs were insured by Safeco[1] under a homeowner's insurance policy that contained an "Additional Living Expenses" ("ALE") provision. That provision states: "If a loss covered under this section makes that part of the residence premises where you reside uninhabitable, we cover Additional Living Expense, meaning the necessary increase in living expenses you incur so that your household can maintain its normal standard of living." ECF 80-1 at 57.

On August 3, 2022, Mrs. Harris contacted Safeco and remediation vendors Servpro and Oregon Restoration. Safeco provided Mrs. Harris with information describing, among other things, how to submit a claim (including electronically) and Safeco's claims management

---

[1] For convenience, the Court refers to Plaintiffs' insurer simply as "Safeco." Some of the actions described below, however, may have been performed by Liberty Mutual Insurance ("Liberty"). In September 2008, Safeco became part of Liberty. *See Our History*, www.safeco.com/about (last visited September 15, 2025).

process. Plaintiffs gave notice of their loss, including damage to their home and personal property and their need for additional living expenses.[2]

On August 4, 2022, Oregon Restoration contacted Safeco and provided details regarding the site restoration at Plaintiff's property. Safeco added both Servpro and Oregon Restoration as "involved parties" on Plaintiffs' claim. On August 5th, Safeco assigned claims adjustor Latoya Tate to Plaintiffs' claim. Also on that day, Mrs. Harris contacted Safeco and, through text messages, was given contact information for claims adjustor Tate. Mrs. Harris called Safeco's general service line and left a message requesting emergency housing. Later that day, a Safeco claims specialist informed Oregon Restoration that Safeco had not yet approved the requested scope of Plaintiffs' claim.

On August 8, 2022, Safeco hired Matthew Hirst, an independent adjustor, to inspect Plaintiffs' premises. Safeco also responded to Mrs. Harris's call by offering her the opportunity to text directly with Tate. When Tate did not respond quickly enough to Mrs. Harris's communications that day, Mrs. Harris had her own insurance agent send an email to Tate. Tate then called Mrs. Harris, who told Tate that she wanted to *buy* a recreational vehicle as temporary living accommodation[3] and that Plaintiffs lived on a "farm" with "livestock" that Plaintiffs did not feel safe leaving. Tate noted in Safeco's claim file that Plaintiffs' insurance policy was a homeowner's policy, not a farm policy, and Tate referred that issue to underwriting. Tate did not ask Mrs. Harris any follow up questions about her livestock or contact underwriting to ask

---

[2] It is unclear whether, and if so when, Plaintiffs filed with Safeco a formal claim. For purposes of the pending motion, the Court will assume that Plaintiffs' notice of loss is the functional equivalent of a formal claim.

[3] Plaintiffs and her attorney also sometimes refer to this requested temporary living accommodation as a "Fifth Wheel trailer" or a "travel trailer." In this Opinion and Order, the Court generally refers to this vehicle simply as a "Fifth Wheel."

questions about the limits for a farm policy versus a homeowners policy. Tate also asked

Safeco's housing vendor, Assured Relocation, for a cost estimate for *renting* a Fifth Wheel.

On August 10, 2022, Safeco's independent adjuster Hirst made an appointment with

Plaintiffs to inspect the premises. Mrs. Harris sent an email to Tate requesting reimbursement for

expenses that Plaintiffs had already paid under the ALE provision, emphasizing that she only had

$120 left in her bank account. Tate responded the next day, August 11th, by explaining that the

coverage issue was pending investigation. Tate also told Mrs. Harris that Safeco had engaged

vendors who could take over the costs when Safeco was "able" and that Tate would be in touch

with Mrs. Harris "soon for the next steps." By that date, Assured Relocations had located a Fifth

Wheel that was available to lease and place on Plaintiffs' property at a total cost for three months

of $15,735.[4] Tate, however, was holding off taking any further steps until after Safeco's

investigation.

Also on August 11, 2022, Tate submitted Plaintiffs' claim to Safeco's special

investigations unit ("SIU") based on the "red flags" regarding whether Plaintiffs made a material

misrepresentation in obtaining a homeowner's policy instead of a farm policy and the fire

causation. Tate requested SIU obtain a recorded statement from Plaintiffs and a "fire report"

regarding the cause of the fire. Later that same day, Hirst concluded that the fire was accidentally

caused by one of Plaintiffs' dogs turning on the stove.

On August 12th, Safeco assigned SIU investigator William Evans to Plaintiffs'

investigation. That same day, Tate notified the restoration vendors that the cause of the fire was

---

[4] It is unclear whether the total cost was $15,735 or $14,835. The "setup" fee is listed at "$1 00.00" [*sic*]. Thus, it is unclear whether that amount is $1,000.00 or $100.00. The Court assumes the higher amount is correct, but for purposes of the pending motion, this ambiguity is not material or relevant.

under investigation and that they should halt all mitigation efforts. Safeco also sent a

"reservation of rights" letter to Plaintiffs. This letter informed Plaintiffs that Safeco's "continued

investigation of the claim is subject to the following reservation of rights." ECF 86-13 at 1. The

letter highlighted certain clauses from the insurance policy relating to an insured's duties after

loss. It then stated that "the reasons for our reservation of rights under the Policy or under

applicable law include, but are not limited to," both "[c]overage pending fire investigation" and

"[r]ecorded Interview pending." *Id.* at 3. The next day, August 13th, Hirst sent his inspection

report to Safeco. His report detailed the damage caused to some kitchen cabinets, appliances, and

a portion of the kitchen ceiling, and the smoke damage that he believed was "cleanable."

On August 15, 2022, Mrs. Harris attempted to telephone Tate and then sent her an email.

Mrs. Harris requested reimbursement under the policy's ALE provision, stating that it was

unacceptable to her that Plaintiffs had to pay for two weeks of expenses. Mrs. Harris further said

that she would hire an attorney "the next day" if she did not receive Safeco's check by overnight

delivery. Tate noted these comments in Safeco's claim file and provided them to the SIU. That

same day, Tate stated in an email to Assured Relocation that "coverage and the fire cause and

origin are still being investigated" and so the rental of the Fifth Wheel was still on hold.

On August 16th before 6am, Tate noted in the file that there was an open SIU

investigation and Safeco employees should not reach out to Plaintiffs. Tate also reviewed a copy

of Hirst's "note" about his investigation conclusion and sent a copy to Evans "to see if this was

sufficient." Tate did not indicate that she sent a copy of Hirst's *report* to Evans. That same day,

Mrs. Harris called Safeco and requested to speak with Tate's supervisor. Mrs. Harris left a

voicemail message but did not hear back. On August 22, 2022, Mrs. Harris again requested

advance payment under her policy's ALE provision while Safeco's investigation was pending.

Tate responded that Mrs. Harris would have to wait until after Safeco's investigation had been

completed. Oregon Restoration also reached out to Safeco regarding its and Servpro's bids, and Tate responded that after Safeco had completed its investigation, Tate would update everyone on the coverage status.

On August 23rd, Tate contacted vendors to obtain bids for some of the work for which Oregon Restoration and Servpro had already submitted bids. Tate did this because the scope and the price of some of the items did not appear to be consistent with Hirst's evaluation of the damages. That same day, SIU investigator Evans conducted most of his investigation. Among other things, Evans contacted Tate for additional information regarding Plaintiffs' claim; searched social media and other internet sites to evaluate the status of the property; reviewed the most recent real estate listing of the property; contacted Hirst for more information, including a description of the fire video; contacted Plaintiffs' former insurance agent; reviewed background information about Plaintiffs (including running "Accurint" and criminal background checks); researched the status of Harris Excavations to see if it was a business that was run out of Plaintiffs' residence; reviewed photographs of the fire damage; and reviewed images of the property from "Eagleview."[5] Evans also contacted Safeco's underwriting group. He learned that if Plaintiffs had fewer than five horses, 20 livestock, and 25 fowl on their property—and if they would have disclosed that information—Safeco likely would have written Plaintiffs a similar homeowner's insurance policy but added an incidental farm rider with only a "nominal" premium increase.

Evans also contacted Mrs. Harris to schedule her recorded statement. She was willing immediately to provide that statement, but Evans was going into a meeting. He asked to schedule her recorded statement later that week, but Mrs. Harris disclosed that she was represented by an

---

[5] Eagleview provides aerial imagery and other property data.

attorney. Shortly thereafter, Evans sent an email to Mrs. Harris with his contact information and asked Mrs. Harris to provide that information to her counsel. Evans learned that Mrs. Harris's attorney was unavailable until September 1, 2022, but he was able to schedule her recorded interview for that date.

Evans conducted his recorded interview of Mrs. Harris on September 1, 2022. Based on this interview, Evans concluded that, based on the number of animals living on Plaintiffs' property, the use of the property qualified for an "incidental farm use" rider. Thus, the expected premium increase—had this information been disclosed—would have been nominal. From this, Evan concluded that Plaintiffs' lack of disclosure was not a material misrepresentation. Evans also received the video surveillance footage from Mrs. Harris on September 1st. He concluded that based on his investigation, "including obtaining video of fire actually starting," the fire started as reported, which was accidentally by a dog owned by Plaintiffs. In speaking with Mrs. Harris, Evans said that he would convey to Safeco Mrs. Harris's "stress" and "concern" about having to move around leave her property during the repairs.

That same day, September 1st, Plaintiffs' attorney wrote to Tate, explaining that Plaintiffs may elect to *purchase* a "Fifth Wheel" as their ALE accommodation. Tate immediately responded that although Safeco's investigation had concluded, Safeco had not agreed to the purchase of a Fifth Wheel trailer. Tate added that Safeco was willing to *lease* a Fifth Wheel for Plaintiffs to use for three months. Tate also described certain shortcomings in Plaintiffs' other ALE reimbursement submissions and requested additional documentation. The next day, September 2nd, Safeco made its first payment to Plaintiffs for their damages.

On September 8, 2022, Plaintiffs filed this lawsuit. This was approximately five weeks after Plaintiffs' date of loss (August 2, 2022) and approximately one week after Safeco offered to *lease* a Fifth Wheel trailer (September 1, 2022) and made its first payment on damages to

Plaintiffs' home and personal property (September 2, 2022). On September 10, 2022, two days after filing this lawsuit, Plaintiffs *purchased* a Fifth Wheel trailer for $119,095.46, including taxes and delivery fees. In their original complaint, Plaintiffs asserted claims alleging breach of contract, breach of the implied covenant of good faith and fair dealing, intentional misrepresentation, intentional infliction of emotional distress, negligence *per se*, and intentional interference with economic relations. Plaintiffs sought $550,000 in economic damages and $500,000 in noneconomic damages.

On November 9, 2022, Safeco made its first payment under the ALE provision of Plaintiffs' homeowner's policy. By December 5, 2022, Safeco paid the remainder of its ALE policy limit of $94,440 and issued more than $100,000 in payments for loss of contents. On April 6, 2023, the parties resolved Plaintiffs' contract claims for an additional payment from Safeco in the amount of $220,000. Thus, Safeco has paid Plaintiffs more than $400,000.

On August 1, 2023, Plaintiffs filed their First Amended Complaint. Although Plaintiffs eliminated their contract claims, which had been settled, they continued to assert claims for intentional infliction of emotional distress; negligence *per se*; and intentional interference with economic relations. In their First Amended Complaint, Plaintiffs sought $250,000 in economic damages, $500,000 in noneconomic damages, and $1 million in punitive damages.

On October 25, 2024, Plaintiffs filed their Second Amended Complaint ("SAC"), which is the operative Complaint in this action. In their SAC, Plaintiffs assert only one claim: negligence *per se*. For that claim, Plaintiffs allege noneconomic damages of $50,000 for Mr. Harris and $15 million for Mrs. Harris, past economic damages of $75,000 for Mrs. Harris

and future economic damages of $250,000 for Mrs. Harris, and additional economic damages of $50,000 for lost business profits.[6]

## DISCUSSION

Plaintiffs' negligence *per se* claim is based on Safeco's alleged violations of ORS § 746.230(1)(a)-(h), and (m)[7] that mostly occurred during the 36 days spanning August 3, 2022, through September 8, 2022. Safeco first argues that because it complied with Oregon Administrative Rule ("OAR") 836-080-0230, as a matter of law it could not have violated ORS § 746.230(1). As explained below, the Court rejects that argument. Safeco next argues that Plaintiffs have failed to show a genuine issue of material fact that Safeco's mostly 36-day course of conduct in resolving Plaintiffs' claim violated any of the alleged statutory provisions and that no reasonable juror could so find. In response, Plaintiffs emphasize Safeco's conduct in this case giving rise to disputed issues of material fact, and rely on the reports and deposition testimony of their expert witnesses Robert Dietz and Robert Moreland. For the reasons stated below, the Court agrees with Safeco in part, notwithstanding the testimony of Messrs. Dietz and Moreland, but rejects Safeco's argument in part based on disputed issues of material fact.

### A. OAR 836-080-0230

OAR 836-080-0230 provides that "[a]n insurer shall complete its claim investigation not later than the 45th day after its receipt of notification of claim, unless the investigation cannot reasonably be completed within that time." Safeco received notice of Plaintiffs' claim on August 3, 2022, and accepted coverage 29 days later on September 1, 2022. Safeco asserts that it

---

[6] Plaintiffs later agreed to drop their request for $50,000 in lost business profits.

[7] ORS § 746.230(1) provides that "[a]n insurer or other person may not commit or perform any of the following unfair claim settlement practices" described in subsections (a) through (n). Plaintiffs do not allege violations of subsections (i) though (l) or (n).

had accepted coverage but was still in the process of adjusting the claim, and that insurance companies must be allowed a reasonable time to adjust claims after accepting coverage. Plaintiffs filed this lawsuit on September 8, 2022, 36 days after submitting their claim to Safeco.

Safeco argues that because Plaintiffs filed their lawsuit before 45 days had elapsed, Plaintiffs "short-circuited" the claims process required under Oregon law. According to Safeco, because Plaintiffs filed their lawsuit before the 45-day period had passed, Plaintiffs cannot show that Safeco violated any of the provisions of ORS § 746.230(1). The Court declines to hold that, as a matter of law, a plaintiff who files a lawsuit within 45 days of submitting an insurance claim may never bring a claim under ORS § 746.230(1). There may be circumstances in which it might be appropriate for an insured to file suit early. Thus, the Court will look to the specific circumstances here, and not simply whether Plaintiffs filed this action within 45 days. Further, the Court will separately address each alleged subsection of ORS § 746.230(1).

## B. ORS § 746.230(1)(a)

This provision prohibits an insurer from "[m]isrepresenting facts or policy provisions in settling claims." ORS § 746.230(1)(a). Plaintiffs allege that Safeco violated this statute by misrepresenting that its ALE provision *does not cover* purchasing a Fifth Wheel and by not fully disclosing the coverage issue under investigation in its reservation of rights letter.

### 1. ALE Policy Fifth Wheel Coverage

Plaintiffs misstate what Safeco represented regarding the ALE provision. Tate began the process of leasing a travel trailer for Plaintiffs on August 8, 2022. She placed that request on hold until after Safeco's investigation closed on September 1, 2022. On that day, Tate made the challenged statement in a letter to Plaintiffs' counsel. Tate did not state that the policy did not cover the purchase of a Fifth Wheel or would never cover the purchase of Fifth Wheel. Rather, Tate explained: "Our vendor is able to assist with a rental for a 3 month lease to reside on the

property. I can reach out to them to set this up, if they would like to reside on the property, as *there is no agreement* to reimburse for a 5th wheel." ECF 86-8 at 35 (emphasis added). There is no evidence any of those statements were a misrepresentation.

Safeco's vendor, Assured Relocation, previously had located a Fifth Wheel rental for three months, which Tate put on hold pending the completion of the SIU investigation. The vendor stated that it would put the rental in "temporary close" but after Safeco completed the investigation the vendor would be "more than happy to reopen" the request and get "the travel trailer option to the insured." ECF 86-8 at 20. Thus, Tate's statement that Safeco's vendor could assist with a rental for three months was true. In short, Plaintiffs offer no evidence that any of Tate's statements were false, let alone that Tate knew of their falsity. *Cf. Mickas v. Nat'l Cas. Ins. Co.*, 2009 WL 10673421, at *5 (D. Ariz. May 20, 2009) (concluding, on a motion to dismiss, that "Plaintiffs have not alleged facts sufficient to raise the right to relief above the speculative level, because they have not properly alleged that NCC had knowledge of the falsity of the alleged misrepresentations").

Plaintiffs also argue that because Safeco ultimately paid the limits of the policy's ALE provision with a cover letter stating that Plaintiffs had incurred costs exceeding policy limits, Safeco "conceded" that the purchase of a Fifth Wheel trailer was a recoverable expense under the ALE provision and thus Tate's statement had to be a misrepresentation. This argument does not save Plaintiff's claim for misrepresentation based on the ALE coverage.

First, regardless of whether the purchase of a Fifth Wheel could be covered under the policy, that does not create a statement that Tate did not make. She did not tell Plaintiffs that the purchase of a Fifth Wheel was *not covered*. She simply wrote to Plaintiffs' attorney that as of September 1, 2022, there was *no agreement* to purchase a Fifth Wheel. Second, her statement that Safeco had not agreed to purchase (and her offer to lease versus purchase) a Fifth Wheel on

September 1, 2022, did not foreclose Safeco from later agreeing to purchase a Fifth Wheel or to reimburse Plaintiffs for the incurred cost of purchasing a Fifth Wheel. There are many reasons an insurer may change its mind and agree to pay policy limits, including learning that the insured will be out of the house longer than originally expected. An insurer changing its mind does not necessarily make the conveyance of its earlier decision a *misrepresentation*. Without any evidence that Tate made a false statement that she knew was false regarding Plaintiffs' ALE coverage, no reasonable juror could find for Plaintiffs on this aspect of their claim under ORS § 746.230(1)(a).

### 2.  Reservation of Rights Letter

Regarding Safeco's reservations of rights letter, Plaintiffs argue that Safeco misrepresented that it was investigating without explaining the farm policy issue, and therefore violated ORS § 746.230(1)(a). The letter cited boilerplate provisions relating to an insured's obligation to cooperate and provide information and then stated that Safeco was reserving its rights pending a fire investigation and a recorded interview by Plaintiffs. Safeco's statement that it was reserving rights "pending fire investigation" was not a misrepresentation. Tate was consistent in reporting that Safeco was conducting a fire investigation—she stated as much to Oregon Restoration and in the internal claims file in warning Safeco employees not to contact Plaintiffs. Indeed, in that internal note she *only* focused on the fire investigation and not the farm coverage aspect of the investigation. Further, Evans conducted his own fire investigation, affirming the findings of Hirst, who submitted his report the day after the reservation of rights letter was generated.

Safeco's statement that it needed a recorded interview by Plaintiff was not an affirmative misrepresentation. As Plaintiffs point out, however, Safeco did not disclose the whole story. Under Oregon law, "one who makes a representation that is misleading because it is in the nature

of a 'half-truth' assumes the obligation to make a full and fair disclosure of the whole truth." *Gregory v. Novak*, 121 Or. App. 651, 655 (1993). Thus, a defendant may be liable if it "assumed the obligation to make a full and fair disclosure of the whole truth by making a representation in the nature of a 'half-truth.'" *Unigestion Holding, S.A. v. UPM Tech., Inc.*, 160 F. Supp. 3d 1214, 1223 (D. Or. 2016) (quoting *Smith v. U.S. Bank, N.A.*, 2011 WL 7628515 at *6 (D. Or. Oct. 26, 2011). In addition to showing that a representation was a "half-truth," to demonstrate liability "based on a half-truth . . ., Plaintiff must show that a relevant person: (1) heard the half-truth; and (2) would have behaved differently had the omitted information been disclosed." *Martell v. Gen. Motors LLC*, 492 F. Supp. 3d 1131, 1143 (D. Or. 2020) (quoting *Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, 2014 WL 5285475, at *13 (D. Or. Oct. 15, 2014) (internal quotation marks omitted)).

Plaintiffs raise a triable issue that the reservation of rights letter contained a "half-truth" in its representation that Safeco needed to take the recorded statement of Plaintiffs. Safeco did not explain the reason it needed to take Plaintiffs' recorded statement—for information about the potential farm policy coverage issue. Had Safeco explained this fact in its August 12, 2022 reservation of rights letter, which it is undisputed that Plaintiffs received, the coverage issue likely could more promptly have been resolved. Mrs. Harris states in her declaration: "Had I been aware that my animals were the reason coverage on my claim was under investigation, I would have promptly provided that information to Defendant." Thus, Plaintiffs raise a genuine issue of fact that Plaintiffs would have behaved differently had the omitted information been disclosed. Accordingly, the Court denies summary judgment on this basis but grants summary judgment on all other grounds based on this subsection.

**C.  ORS § 746.230(1)(b)**

ORS §746.230(1)(b) prohibits an insurer from "[f]ailing to acknowledge and act promptly upon communications relating to claims." Safeco argues that it could not have violated this provision because under OAR 836-080-0225(3), an insurer must reply "not later than the 30th day after receipt" to claims-related communications, and Safeco responded within that time frame. The Court does not rely on the regulations, but looks to the specific facts of Safeco's communications.

Plaintiffs rely on Mrs. Harris's contemporaneous telephone log and Safeco's claim file to argue that there is an issue of fact as to whether Safeco acted promptly in responding to Mrs. Harris's communications. Plaintiffs highlight that Mrs. Harris called Safeco nine times between August 3 to 23, 2022, but Safeco only called her five times. This simplistic enumeration of the number of calls does not properly consider the nature of the communications. One inbound call was transferred to the "queue" after the initial screener provided Mrs. Harris by text message with information on how to contact a claims specialist, and Mrs. Harris's call log states that the call dropped. The claim file log states that Mrs. Harris hung up the next call while in the screening system. Neither of those calls required further follow-up. The next call was screened and transferred to a specialist (logged as a separate call), who noted that the claim needs to be assigned an adjustor "ASAP." That was Friday, September 5th, and Tate was assigned that day. Tate contacted Mrs. Harris on Monday, September 8th, the next business day, although not until after two more calls by Mrs. Harris.

Mrs. Harris made six calls to Tate's one outbound call, but no reasonable juror could find that Safeco failed to act promptly in response to the calls that required action. Safeco provided Mrs. Harris with contact information and the ability to communicate by text, promptly assigned a

claims adjustor, and the claims adjustor contacted Mrs. Harris, all within five days, including an intervening weekend.

Plaintiffs next argue that Mrs. Harris's two telephone calls and one email from August 15th and 16th were never returned. Here, Plaintiffs fail to state all relevant and undisputed facts. On August 11th, Tate notified Mrs. Harris that the coverage was under investigation and Safeco had engaged vendors to take over costs "once we're able." On August 12th, Safeco sent its reservation of rights letter to Plaintiffs, indicating that Safeco was conducting a fire investigation and required a recorded interview.

That same day, Tate notified Plaintiffs' restoration vendor that there had been no investigation into the "cause and origination" of the fire, Safeco was not proceeding pending a field and SIU investigation, Tate was sending a reservation of rights letter to Plaintiffs, and all mitigation should stop. At that point, it was clear that Safeco was investigating the claim and that claim payments were on hold until after the investigation had been completed. When Mrs. Harris continued to call and email despite the ongoing investigation, Tate sent an email on August 22, 2022, which explained that she had reached out to the investigator, asked the investigator if there is anything he needed, and explained to Mrs. Harris that "as soon as [the investigator has] released his investigation, I can finalize coverage." The Court has reviewed the call log information and claims file evidence and finds that no reasonable juror could conclude that Safeco did not act reasonably promptly in responding to Plaintiffs' communications.

**D. ORS § 746.230(1)(c)**

This provision prohibits an insurer from "[f]ailing to adopt and implement reasonable standards for the prompt investigation of claims." Plaintiffs argue that Safeco violated this provision because Tate referred Plaintiffs' claims to an unnecessary SIU investigation.

PAGE 16 – OPINION AND ORDER

Viewing the facts in the light most favorable to Plaintiffs, the Court agrees. On August 8, 2022, claims adjuster Tate spoke with Mrs. Harris. At that time Tate learned about livestock and the potential farm policy coverage issue, but she did not ask any follow up questions of Mrs. Harris. She submitted the issue to underwriting but did not ask underwriting what information was needed to ascertain whether a farm policy instead of a homeowners policy would have been needed. Safeco also had Hirst inspect the Harris's residence on August 11, 2022, yet did not have him inspect the livestock or ask Mrs. Harris about the issue to have that information on hand. That evening, after having viewed the surveillance video, Hirst entered his conclusion into the claim file system that the fire was caused by accident from the dog jumping on the stove. He added that mitigation efforts should continue. Hirst submitted his official report to Safeco on August 13, 2022, the day after SIU investigator Evans was assigned, providing his conclusions.

Safeco, however, did not alter its course of action after Hirst's reports on August 11th or 13th. On August 16th, Tate forwarded Hirst's conclusions to Evans, although it does not appear that she forwarded his formal report. Evans did not appear to do anything with this information until his investigation on August 23rd.

Evans spent a few hours on his investigation on August 23rd. For the cause of the fire, he viewed some photographs but primarily appears to have relied on a telephone conversation with Hirst. Evans did not review any video at that time, but simply discussed the video with Hirst. Most of his investigation was focused on the farm policy issue. He investigated the background of Plaintiffs and the property, viewed photographs and online images, contacted Plaintiffs' former insurance agent, contacted underwriting to find out the threshold number of livestock for a farm, and contacted Mrs. Harris to schedule a statement regarding the number of livestock. On September 1st Evans obtained and reviewed the video footage and obtained Mrs. Harris's

recorded statement. At that time he concluded his investigation, finding that the livestock was below the farm threshold and thus Plaintiffs did not make a material misrepresentation and that the fire started as reported (and depicted on the video and concluded by Hirst), accidentally by Plaintiffs' dog.

A reasonable juror could conclude that Safeco did not implement a reasonable investigation into the fire causation and farm policy issues. For the fire, Hirst viewed the video and documented his conclusion on August 11th, with his formal report on August 13th. Hirst recommended on August 11th that mitigation continue and told Mrs. Harris that she should expect her first check. Yet Tate kept the mitigation vendors and other payments shut down until the SIU investigation ended, contrary to Hirst's recommendation. Evans did little more than talk with Hirst and watch the same videos he watched to reach the same conclusion as Hirst, only three weeks later. Viewing the facts in the light most favorable to Plaintiffs, there was no need for an SIU investigation into the cause of the fire after Hirst submitted his report.

For the farm policy issue, a reasonable juror could conclude that it was unreasonable for Tate not to ask any follow up questions after Mrs. Harris disclosed via telephone on August 8th about having livestock, to ask basic questions of underwriting instead of simply referring the case, or to at least have Hirst review the potential farm indicators when he inspected the premises on August 11th. The Court thus denies summary judgment on this portion of Plaintiffs' claim.

## E. ORS § 746.230(1)(d)

Under ORS § 746.230(1)(d), an insurer is prohibited from "[r]efusing to pay claims without conducting a reasonable investigation based on all available information." Safeco did not *refuse* to pay Plaintiffs' claim. Safeco accepted coverage on September 1, 2022. Safeco also promptly began making payments on the dwelling and offered to lease a Fifth Wheel for Plaintiffs for three months. Safeco also asked for receipts (instead of simply accepting copies of

checks submitted by Plaintiffs) for other ALE expenses. In sum, Safeco did not "refuse" to pay

Plaintiffs' claims. Thus, the Court finds that no reasonable juror could find that Safeco violated

this provision. *See, e.g.*, *Hayter v. Travelers Indem. Co.*, 2025 WL 2209971, at *7 (D. Or.

Aug. 4, 2025) ("[T]he Court finds that no reasonable juror could conclude Defendants' conduct

violated ORS 746.230(1)(d) because Defendants never *refused* to pay Plaintiff's UM claims."

(emphasis in original)).[8]

---

[8] Plaintiffs argue that there is an issue of fact whether Safeco was obligated to make *advance* payments under its ALE provision, and that failing to make advance payments violated this provision. The Court disagrees that failing to make advance payments, as opposed to *denying a claim*, is a violation of this provision. Even if it were, however, the Court also finds Plaintiffs' expert witness testimony on this issue to be unhelpful and unreliable. Although Safeco did not challenge the admissibility of Plaintiffs' expert opinion testimony, the Federal Rules of Evidence "call upon the [trial] courts to serve as gatekeepers who independently evaluate the admissibility of expert opinion testimony." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 532 (6th Cir. 2008) (quoting *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 415 n.3 (3d Cir. 2002)). "A district court may disregard an expert's opinion offered in opposition to summary judgment if the opinion is legally insufficient to create a material issue of fact for trial." *Kauffman v. Manchester Tank & Equip. Co.*, 203 F.3d 831, 832 (9th Cir. 1999) (unpublished). An expert's opinion may be insufficient when it "is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)). "Expert testimony cannot create a genuine issue of material fact if it rests on assumptions that are not supported by evidence." *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019).

Most of the cited portions of Plaintiffs' expert reports are simply slanted recitations of fact, which are unhelpful and inadmissible. *See In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999) ("[A]n expert report cannot be used to prove the existence of facts set forth therein."). Also, many of the statements by the expert witnesses are speculative and mirror Plaintiffs' contentions. "A party's own speculation is insufficient to create a genuine issue of material fact, and a party cannot make it sufficient simply by finding an expert who is willing to assume its correctness." *Stephens*, 935 F.3d at 856-57 (citation omitted). Moreland's testimony is vague, stating that "typically" advance payments are made for personal property but "can" be made for dwellings and usually happen when there are no concerns about coverage, but with coverage concerns an insurer would include a non-waiver and a "claw back" provision to reclaim funds. Dietz states that advance payments with a "claw back" are "industry custom" in cases where insureds are "vulnerable," "displaced," and financially "dwarfed" by the insurance company. Dietz's opinion would apply to nearly every insured, whose resources are almost always

**F. ORS § 746.230(1)(e)**

This provision precludes an insurer from "[f]ailing to affirm or deny coverage of claims within a reasonable time after completed proof of loss statements have been submitted." ORS § 746.230(1)(e). Safeco argues that OAR 836-080-0235 establishes what constitutes a "reasonable time" as a matter of law.[9] This regulation provides that "[a]n insurer shall, not later than the 30th day after its receipt of properly executed proofs of loss from a first party claimant, advise the claimant of the acceptance or denial of the claim." OAR 836-080-0235(1). It also provides that if an insurer needs more than 30 days, it must provide an explanation in writing "not later than the 30th day after receipt of the proofs of loss, giving the reason more time is needed" and every 45 days thereafter. OAR 836-080-0235(4).

It is unclear whether Plaintiffs provided "properly executed proofs of loss." Regardless, for purposes of this motion, Safeco does not challenge whether the notification Plaintiffs provided on August 3, 2022, qualifies for this provision. It also is undisputed that Safeco accepted coverage on September 1, 2022. Thus, Safeco advised Plaintiffs within 30 days that it had accepted coverage. Safeco therefore complied with OAR 836-080-0235.

The Court, however, finds that OAR 836-080-0235 creates an independent obligation, to affirm or deny coverage "not later than the 30th day" after receiving the proof of loss, separate from the statutory obligation in ORS § 746.230(1)(e) to affirm or deny coverage within a "reasonable time." There may be circumstances in which a "reasonable time" could be shorter

---

"dwarfed" by those of an insurance company. Further, neither expert witness explains how a "claw back" would be feasible under the circumstances presented in this case.

[9] Plaintiffs argue that they are not relying on OAR 836-080-0235 in their claim and thus it is irrelevant to this case. Whether Plaintiffs rely on this OAR, however, does not affect whether the OAR establishes the time by which an insurer must accept or deny coverage.

than 30 days. In such circumstances, it might be unreasonable for an insurance company to wait until the 30th day to accept coverage. Thus, simply because Safeco accepted coverage within 30 days does not preclude Plaintiffs' claim.

Viewing the facts of this case in the light most favorable to Plaintiffs, they have raised a genuine dispute of material fact regarding whether Safeco accepted or denied coverage in a "reasonable time." As discussed above in analyzing Plaintiffs' claim under ORS § 746.230(1)(c), a reasonable juror could conclude that Safeco did not implement reasonable standards for the prompt investigation of Plaintiffs' claim. That includes promptly investigating the two coverage issues that delayed Safeco's decision to affirm or deny coverage, including by waiting for an SIU investigation that may not have been necessary. There were thus opportunities for Safeco to affirm coverage much sooner than waiting for the conclusion of the SIU investigation. The Court thus denies summary judgment on this portion of Plaintiffs' claim.

### G. ORS § 746.230(1)(f)

Under this provision, an insurer is prohibited from "[n]ot attempting, in good faith, to promptly and equitably settle claims in which liability has become reasonably clear." ORS § 746.230(1)(f). Plaintiffs argue that Safeco violated this provision by failing to advance payments to Plaintiffs under the ALE provision. Plaintiffs, however, provide no authority for the proposition that failing to provide *advance* payments on a claim constitutes failing to *settle* a claim. The Court finds that it does not. Settling a claim means reaching final resolution on the claim. *See, e.g.*, *Settlement, Black's Law Dictionary* (12th ed. 2024) (defining "settlement" in relevant part as "[a]n agreement ending a dispute or lawsuit"). Plaintiffs do not contend that had Safeco advanced some payments on the ALE policy, that would have extinguished Plaintiffs' rights under the ALE policy.

**H. ORS § 746.230(1)(g)**

As noted, this provision prohibits an insurer from "[c]ompelling claimants to initiate litigation to recover amounts due *by offering* substantially less than amounts ultimately recovered in actions brought by such claimants." ORS § 746.230(1)(g) (emphasis added). It does not prohibit compelling an insured to file a lawsuit by engaging in various claim practices—it prohibits compelling an insured to file suit by offering a lowball settlement amount.

Plaintiffs argue that they were compelled to file suit because of Safeco's conduct in failing to *advance* ALE payments and subjecting Plaintiffs to an unnecessary SIU investigation. That conduct, however, is not prohibited by § 746.230(1)(g).[10] Plaintiffs argue that the only pre-litigation "offer" they received was for a lease of a Fifth Wheel, and the amount of that "offer" was never disclosed to Plaintiffs. Thus, by Plaintiffs' own concession, they did not receive any pre-litigation settlement offer that compelled them to file suit.

Plaintiffs also assert that they "ultimately recovered" more than they were "offered" under the ALE provision and thus have made a "prima facie" case under this statutory provision. This argument fails because Safeco did not make a settlement offer on the ALE claim. Tate stated that Safeco had not agreed to purchase a Fifth Wheel but would rent one for three months. That is not a settlement offer. Had Plaintiffs agreed to the Fifth Wheel rental, that would not have closed out Plaintiffs' ALE claim. Safeco also could have reimbursed Plaintiffs' other ALE expenses incurred before the lease of the Fifth Wheel, Plaintiffs might have needed to lease a

---

[10] Even if conduct other than prelitigation settlement offers were included in ORS § 746.230(1)(g), Plaintiffs' argument would still fail. Safeco accepted coverage on September 1, 2022, and began making payments the next day. Safeco had asked for the required documents for ALE reimbursement, but it still offered to lease a Fifth Wheel for Plaintiffs. Thus, Plaintiffs were receiving benefits from their policies, including the option of a Fifth Wheel trailer in which to live temporarily. No reasonable juror could find that Safeco "compelled" Plaintiffs to file a lawsuit just seven days after Safeco accepted coverage.

Fifth Wheel for longer than three months, and Plaintiffs might have had ongoing additional living expenses. Furthermore, if Plaintiffs would have responded to Tate with evidence that they would have to be out of the house for a year, Safeco may have changed its position regarding purchase versus lease.

No reasonable juror could construe Tate's communication on September 1, 2022 as an offer under ORS § 746.230(1)(g). The Court rejects Plaintiffs' attempt to categorize Safeco's initial refusal to cover the purchase of a Fifth Wheel as a settlement offer under § 746.230(g). Plaintiffs filed suit before Safeco tendered any settlement offer. Thus, no reasonable juror could conclude that Safeco violated this provision. *See Hayter*, 2025 WL 2209971, at *7 ("The Court also finds that Defendants' conduct could not have compelled arbitration—in violation of ORS 746.230(1)(g)—because Plaintiff demanded arbitration *before* Defendants had the opportunity to value Plaintiff's claim or tender a settlement offer." (emphasis in original)).

## I. ORS § 746.230(1)(h)

This provision prohibits an insurer from "[a]ttempting to settle claims for less than the amount to which a reasonable person would believe a reasonable person was entitled after referring to written or printed advertising material accompanying or made part of an application." ORS § 746.230(1)(h). Plaintiffs argue that Safeco violated this provision by refusing to purchase a Fifth Wheel trailer, which Plaintiffs contend they reasonably believed was necessary under the policy.

Plaintiffs' claim under this provision fails for the same reason as their claim under § 746.230(1)(g)—because Safeco never attempted to *settle* the ALE claim. Plaintiffs filed suit before the settlement process began. No reasonable juror could conclude otherwise.

**J.  ORS § 746.230(1)(m)**

This provision prohibits an insurer from "[f]ailing to promptly provide the proper explanation of the basis relied on in the insurance policy in relation to the facts or applicable law for the denial of a claim." ORS § 746.230(1)(m). Plaintiffs fail to show an issue of fact regarding a violation of ORS § 746.230(1)(m) because Safeco never *denied* Plaintiffs' claim. Safeco accepted coverage.

Plaintiffs argue that Safeco denied without explanation the purchase of a Fifth Wheel trailer under the ALE provision. Safeco, however, did not deny *without explanation* purchasing a Fifth Wheel trailer—Safeco merely stated that it had not agreed to *purchase* a trailer for Plaintiffs but that it would *lease* a trailer for them for three months. Offering to lease instead of purchase a trailer is not the functional equivalent of *denying* Plaintiffs' claim. All that Safeco did was deny Plaintiffs' request for a specific type of living accommodation, namely the purchase of a Fifth Wheel, rather than its rental. No reasonable juror could find that Safeco violated ORS § 746.230(1)(m) by offering to lease a Fifth Wheel trailer.

**K.  Motion to Strike**

Safeco moves to strike Plaintiffs' references to evidence that after Plaintiffs filed this lawsuit, Safeco terminated the employment of Tate for performance reasons because she delayed in communicating with insureds. Safeco argues that it is undisputed that Tate's termination was unrelated to her conduct regarding Plaintiffs' claim. The Court denies this motion as moot. The Court, however, only considers the evidence of Tate's communications with *Plaintiffs* in evaluating Plaintiffs' claims in this lawsuit.

## CONCLUSION

The Court GRANTS IN PART Safeco's Motion Summary Judgment, ECF 79. The Court denies the motion based on OAR 836-080-0230 and as against Plaintiff's claims based on ORS

§ 746.230(1)(c) and (e), and § 746.230(1)(a) based on the disclosure of the half-truth that Safeco needed to take Plaintiffs' recorded statement without fully disclosing its farm policy coverage concerns. The Court grants the motion in all other respects.

**IT IS SO ORDERED**.

DATED this 17th day of September, 2025.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge